We will hear first from Ms. McIntyre on behalf of Sealed Juvenile. Yes, good afternoon. May it please the Court. Juveniles are different. In recognition of this, the Juvenile Delinquency Act allows the prosecution of juveniles in federal court in only certain limited circumstances. And that's in recognition of the fact that the federal system is not made for juveniles. The federal system does not have the appropriate resources to deal with juveniles. They cannot adequately house juveniles. And so only when there is certification of, I believe it's one of three different circumstances, can the federal court prosecute a juvenile as a juvenile. In this case, the state of Mississippi could have adjudicated the conduct at issue. And in fact, the state of Mississippi was already at all relevant times exercising jurisdiction over the juvenile. And so for that reason, the prosecution of juvenile under the Juvenile Delinquency Act and in federal court not only frustrated the purposes of the act, but constituted a deprivation of his due process rights and it was an improper certification. In addition to that, the act which brought juvenile before the federal court was the possession of a machine gun, as is criminalized if he had been an adult under 18 U.S.C. 922-0. We've asserted an independent argument that post-Bruin, machine guns should be afforded Second Amendment protection and that the government has failed to demonstrate that the prosecution of juvenile for the possession of machine guns was constitutional and was accordingly in violation of his Second Amendment rights. I'll begin with the certification argument unless there's a different, unless there are questions otherwise. So as I said, juveniles are different. In this case, the government claimed that Mississippi did not have jurisdiction over the juvenile because they had no law at the time regulating the possession of machine guns. 922-0, as we all know, regulates the possession not only of a fully equipped machine gun, but also integral component parts. So in this case, a Glock switch, an auto sear device that can be attached to a Glock in order to allow it to shoot without requiring additional pulls of the trigger mechanism. So qualifying as a machine gun under, I believe it's 58, maybe 64. Well, the government alleged that the mere possession of switches and machine guns was not a violation of Mississippi state law. Mississippi did punish and still criminalizes the possession of handguns by juveniles. And in this case, while the government stated that it was only pursuing the switch claim, the information actually charging the juvenile was blanket statement, he has violated 922-0. A violation of 922-0 also necessarily encompasses the possession of a handgun equipped with a switch, which the government later stated during its proof for the factual basis at the plea colloquy they had evidence that he had possessed. And so we're submitting that it was disingenuous and in violation of the Juvenile Delinquency Act to allow a prosecution to occur in federal court for conduct that clearly could have been prosecuted under Mississippi state law. Counsel, what is your argument or what's your best case for the idea that the defendant, the juvenile defendant, can raise an objection to a 5032 certification? Right, so I take your point that they shouldn't have done it. Right. But as far as I can see from the cases, all we've said is that it's a jurisdictional requirement that they do it. Right. So it kind of looks like if you've done 2255 cases, it looks like a COA. Right. It's like it's a jurisdictional requirement that it exists. But I'm not sure I understand the standard for what happens when they do the thing to make it exist that you can then effectively attack the certification. So we moved under the theory that it was a due process violation. Certification being the jurisdictional requirement. We argued that the district court had the obligation to ensure that jurisdiction was appropriate in that court and that to continue with a prosecution that was in violation of the Juvenile Delinquency Act would result in a due process violation. So it was that due process violation that we said was the vehicle that could get us into the district court to actually challenge the basis of the certification, the basis of the prosecution. Do other courts recognize that move, that using the due process clause as a way to attack the 5032? It's unclear. Courts certainly have said that the certification process does implicate due process concerns. And the Juvenile Delinquency Act is clearly intended to protect those due process concerns. But the case law as it exists is pretty sparse. It's infrequent because of the purposes of the Juvenile Delinquency Act, because of the presumption against juvenile prosecutions. We just don't have many cases specifically interpreting this statute, the 5032. And the cases that I saw generally dealt with instances where the child was being adjudicated as an adult or where there was a different prong of the certification process that was at issue, not this specific issue of the state being able to prosecute that conduct. Has our court engaged on this question? Not that I'm aware of, not this specific question. There have certainly been cases that have confirmed that the certification issue is a jurisdictional issue. There are certainly cases that have said that there are due process concerns inherent to the juveniles, especially in this realm and in the certification context. But as far as I know, this court hasn't addressed this discrete issue here. And I haven't really seen many cases across the country that have dealt with the certification, the state versus federal, especially not outside of the district court. And so that's our initial basis is the fact that Mississippi was already exercising jurisdiction over him, even if there was some kind of argument that the government could pick the switches at one time but then penalize him for conduct at another time and not be required to specifically allege any of that conduct in the information. In this case, it's even more compelling because the juvenile was already under indictment in a Mississippi state case at the time that he was prosecuted for the possession of the Glock switches. And in part, his bond was actually revoked in the state court proceedings based on the federal alleged conduct. It was the sale and possession of the Glock switches. And so I think that's more evidence that these are inherently intertwined situations. And even the fact that juvenile was able to be adequately housed in this matter was the fact that he was already being taken care of by the state of Mississippi because otherwise there's no even remotely close geographic location that juvenile could have been housed in pending this prosecution, which is, again, another part of the basis behind the JDA, the Juvenile Delinquency Act, that federal prosecution will frequently result in the juvenile being taken away from his home, being taken away from his family, his school, all of the resources that are there to help him and to avoid the stigma of an adult criminal conviction. And if there are no further questions about the jurisdiction due process, I'm happy to move to the 922-0 prosecution. Post-Bruin, I'm not aware of any federal circuit courts that have addressed the constitutionality of 18 U.S.C. 922-0. There are certainly district courts who have resolved it favorably to us. Judge Reeves in the Southern District of Mississippi has dismissed an indictment based on prosecution under 922-0, as has, I believe, a judge in the District of Kansas in a case United States v. Morgan. The analysis that both of those district courts have adopted and which we would urge here is that after Bruin, step one of the analysis of a firearms challenge requires a consideration of the plain text of the statute and whether the statute or regulation at issue fits within the plain text of the Second Amendment. In this case, it's clear that it does. The ban on a possession of a machine gun is clearly a restriction on the right to bear and possess arms. While this court addressed the ban on machine guns in Hollis v. Lynch, that was a pre-Bruin case that has now been rendered obsolete in light of Diaz, Connolly, and all of the later jurisprudence in this court addressing G offenses as well as 922 as a whole. And Hollis, while it relied on Dicta and Heller addressing machine guns, they never actually undertook any kind of historical analysis that could justify the regulation. So they applied step one, but they didn't apply Bruin step one. They applied step one of means and scrutiny, which is now obsolete. They applied the step of what is the scope of the right and how does it infringe on the scope of the right. They didn't consider whether the statute at issue actually was implicated by the plain text of the Second Amendment. And so they relied on this dangerous and unusual historic tradition that they said was relevant but is more akin to what we now have in step two of Bruin. So Hollis did not actually deal with step one. And then when they went to step two, they didn't apply the same analysis that we now require in this circuit after Diaz and that line of cases. Diaz says when there is no precedent that's actually conducting Bruin's historical inquiry, it is up to this court to perform that historical analysis and tradition. And that tradition is meant to be offered and provided by the government. It is their burden to present that. That's the principle of party presentation. There's a footnote in Bruin, I think it's note six, as well as in Daniels. They affirmed that when you have an issue that is dealing with the historical tradition, in that case, I think it was presumptive dangerousness. It is the government's burden to actually put forth those analogs that would justify the implication on the Second Amendment right. And in this case, the government hasn't offered any historical tradition. They've relied on those pre-Bruin cases, which, as we submit in the briefs and today, are based either on dicta or are wholly obsolete or applied the wrong test. They applied means and scrutiny. And so in this case, in addition to applying the wrong standard, I think it's also important that we consider, even if we agree that dangerous and unusual could be an appropriate historical analog, I think Bruin says that it could be, the government still has to prove that machine guns are both dangerous and unusual. All firearms are dangerous. And in Hollis, the method of determining whether a machine gun was unusual dealt with statistics that were available at the time. Those statistics have wildly changed. We've cited statistics from ATF that are showing that now, even just the legal possession of machine guns, for which there was a carve-out in 1986, I would argue that additionally provides reason for why they're not dangerous writ large, that number is four times the number that Hollis said was not unusual. And so when you look at the metrics that Hollis v. Lynch adopted, without any kind of argument from the government that those statistics were incorrect, I think that mandates a finding that they are, while dangerous, like all firearms, are not necessarily unusual. And while there may be policy arguments that might favor in, you know, in terms of not allowing for the possession of machine guns, I think that Bruin says that we can't consider those arguments when we're considering a Second Amendment challenge. Barring any questions from the court, I think that's really the heart of our argument. One being that there was no appropriate jurisdiction for a juvenile to be federally prosecuted, and the prosecution in federal court frustrated the purposes of the Juvenile Delinquency Act. It amounted to a violation of his due process rights and was an improper certification requiring this court's dismissal. And additionally, the prosecution under 922-0 amounted to a violation of his Second Amendment rights as applied, and 922-0 is facially unconstitutional in the absence of any relevant historical tradition offered by the government to show otherwise. None. Thank you very much. I'll reserve the remainder of my time. You've saved five minutes for rebuttal. Thank you. We will hear next from Mr. Buckner on behalf of the United States. May it please the court. My name is Jonathan Buckner, and I, along with my co-counsel Lee Smith, represent the United States in this case. Really, there's three issues for the court to consider. First is the certification issue. Then there's the Second Amendment challenge. And then what was raised in the brief, the third issue was Loper-Bright and its application to the ATS rulemaking. It seems like we've kind of gotten away from that. If I have time, I'll address that, but I want to focus on the first two issues. First, under the certification issue, it's true that the Juvenile Justice and Delinquency Prevention Act permits the federal government to proceed in a delinquency action against a juvenile in certain factual circumstances. The one that's applicable here is when the government certifies that the state does not have jurisdiction over the juvenile with respect to said alleged acts of juvenile delinquency. So what we really have to focus on is what the alleged acts of juvenile delinquency were in this case. Do you dispute that the state court revoked bail on account of the federal charges? That was part of the – I think that was part of the state court's consideration, but it was not the only grounds for the state court's consideration. And again, that doesn't really go into whether the state court – the state has jurisdiction over him for the alleged acts of delinquency. So the alleged acts of delinquency were two discrete instances where he actually sold machine gun conversion devices or clock switches to a confidential source in February of 2024. And so what's undisputed is that in February of 2024, there was no state law in Mississippi that prohibited anyone from possessing a machine gun conversion device. And that's what he did on those two dates. He possessed and transferred it. That's what he was charged with. So even though that act may have gone into the state court's consideration, there were additional things that the state court considered, and the state court couldn't proceed against him for that specific act in a delinquency action. There was no law that authorized it. The defense – or the juvenile in the brief says, well, Mississippi law precluded a minor from possessing handguns. But handguns under Mississippi law required the gun to be able to fire a shot or a bullet, and Judge McNeil specifically referenced that and said a machine gun conversion device doesn't qualify. There was a state law that prohibited the possession of concealed machine guns. There's no dispute that at the time of this instance, machine guns didn't include machine gun conversion devices, and it only prohibited concealed machine guns. He didn't conceal it. He possessed it and transferred it. So it's – to the extent that the court considered as relevant conduct at sentencing his actual possession of handguns, that doesn't mean that the actual alleged acts of juvenile delinquency could have been proceeded against him in state court. And again, there's reference to the government relying on his possession of a handgun. There's a video of him firing a handgun with a Glock switch, and that was relied upon in the factual basis to show his knowledge of what the machine gun conversion devices did. It's evidence, but it's not the offense with which he was charged. So at the heart of the matter, this insinuation that the state could have proceeded against him for his possession and transfer of machine gun conversion devices on February 7th and February 20th of 2024, it's just not true. And the record demonstrates that. Counsel, can I move you to 922-0? Yes. Yes, Your Honor. If my colleagues have questions about the rest, I'm sure they'll interrupt me, but I have questions about 922-0. I'm looking at page 4 of your red brief. You helpfully include a picture from ROA 311. Which part of this Glock switch is the machine gun? The entire thing is a machine gun under 922-0 and under the definition set forth in 26 U.S.C. 584-5. Do you have a preferred nomenclature for how I'm going to refer to these three parts? Because they're deconstructed in your brief. So I'm happy to refer to them by whatever name you would like to use them. There's the switch, the cap, and then there's the trigger bar disconnector. Do you have a – but I'll use whatever terms you have. We can use the court's terms. Great. So can we talk about the trigger bar disconnector? Yes, Your Honor. What's your understanding of how that works? My understanding – I can't speak to the specific parts within the machine gun conversion device. I can just say as a whole, my understanding is it depresses a portion of the firearm so that the firearm can be pulled, the trigger can be pulled with one pull and repeatedly fire. But it's all three of those parts together that allows it to do that. But if I had one part that would hold down the trigger bar, that would be a machine gun? I'm sorry, Your Honor. If I had one part that would hold down the trigger bar such that it would not catch the firing pin, that would be a machine gun in your view? I think under 5845 it would qualify as a machine gun, yes, Your Honor. I'm sorry. What was your citation? 5845, 26 U.S.C. 5845, which is what defines machine gun because it would be a part or combination of parts used to essentially render a semiautomatic weapon automatically. But any single part that would be sufficient to hold down any other part of the gun and allow it to fire in an automatic fashion, that would be a machine gun? If it was designed and intended for that use, yes, it would. What if I took a coat hanger and I twisted it and I tin snipped it so that it would fit into the lower receiver of an AR-15? Would that be a machine gun? I think once it's in the AR-15, it would be a machine gun. No, just sitting on my desk. I fiddle with stuff all the time, so I'm just twisting some metal, and it's just a piece of sort of like a funny kind of U-shaped piece of a coat hanger. Would that be a machine gun? If it was designed and intended for that use, I think it would be under the statute. And how would you know if it was? Is it sitting on my desk as I twist it up, coat hanger? And that's where the video of the juvenile firing the Glock switch with it in fully automatic mode comes into play, right? Like we wouldn't know. We'd have to find some other evidence of intent or motive. We couldn't just charge you for having something sitting there on your desk. So for all the coat hanger possessors out there, they don't need to worry that the United States government is going to come and put them in federal prison for 10 years for possessing a part? If they're telling people that they're going to flood the coast with coat hangers in order to turn firearms into automatics, they might get charged. Well, respectfully, I asked you at the very beginning, which part of this is the machine gun? And you said it was these three things together. You didn't say that it needs to be these things together with the YouTube video or these three things together combined with telling people stuff on social media. The three things together, right? So all you got and all you need are the four sales—I guess you had more than four, six or eight—sales to ATF agents of the parts, right? So we had two separate purchases from him of the parts. But then in addition, there was other evidence showing that he was distributing these for the purpose of turning semi-automatic weapons into automatic weapons. But the second purchase was these four ones, the four Glock switches that are on page four of your brief. I believe the second purchase was eight. The first purchase was four. So they purchased four from him on February 7th, and they purchased eight from him on February 20th. Got it. Thank you for the clarification. So those pieces of plastic, those constitute a machine gun just like the coat hanger can constitute a machine gun. There's posts on the internet about how you can twist up pieces of an index card and use that as a drop-in auto sear. I assume that would be a machine gun. How am I supposed to know if I twist it up? My kids twist up paper all the time. Did it last night at dinner. How do I know when it's a machine gun? Again, I think that the intent of the design matters, and that's included in the definition of machine gun under 5845. Very good. But your view is that it can be a machine gun for purposes of federal law and for purposes of putting this juvenile in prison for 10 years, but it is somehow not protected at all as an arm under the Second Amendment. That's correct, Your Honor. Because apparently it can be super, super dangerous for purposes of Title 26 and Title 18, 922L, but not dangerous at all for purposes of being an arm. I think that it obviously enhances the danger of a firearm when it's attached to a firearm, right? Were these attached to a firearm? No, these were not attached to a firearm. And that's entirely your argument as to why it's not protected by the Second Amendment. I think that— Because they were just pieces of plastic, right? That's our first argument, yes, Your Honor. So they're horrible, terrible, dangerous weapons of death for purposes of a 10-year statutory penalty, but they're just pieces of plastic for purposes of the Second Amendment? I understand the court's concern, but I think that is our position, and this is the position that Judge McNeill took, too, because at the end of the day, separate and apart from a firearm, and these were separate and apart from a firearm— Just like my coat hanger and my kid's paper. Right, but they were sold for the purposes of being used in a firearm. They are—they're not arms. They can't be—by themselves, they can't do anything. They have to be attached to the firearm in order to do it. But also, on the flip side, a firearm doesn't have to have them to be a working firearm. Is a bayonet a Second Amendment-protected arm? I think whether it's attached to a—yes, it is. It can be used, obviously. Yeah, right, it is. Weapons in the 1780s and 1790s, they all had bayonets. Of course the United States would agree with me that a bayonet is an arm. It has to be. It was part of the standard-issue Army kit. Bayonets were everywhere. Right. Okay. Not necessary at all to the functioning of a rifle. But I think separate and apart from being attached to a rifle, a bayonet's an arm. But it can be used as essentially a knife or a dagger. It can be used for self-defense. It can be used to strike someone in wrath. I think that's some of the language that Justice Scalia used, separate and apart from it. It's, in and of itself, a tool of defense or offense. Yeah, I appreciate the candor because this makes perfect sense to me, that it has to be broader than just something necessary to the functioning of the firearm. But what I'm saying is I think that a bayonet, you separate it from the firearm, it still could be used to kill someone or defend yourself. A Glock switch, you separate it from a firearm, it's doing nothing. It's just sitting there. Ammunition, obviously, that's separate and apart from the firearm. I suppose there are circumstances where it can be dangerous, but it's not certainly dangerous for its intended purpose. A bayonet or a Glock switch? I'm sorry, for ammunition. The audio is terrible. Ammunition separated from a firearm, obviously not particularly dangerous. But ammunition is vital. It's a vital component of what makes a firearm a firearm. Yeah, but not all ammunition is. Some weapons have different caliber bolts, for example. It can shoot different kinds. So maybe Congress could ban some of the ammunition but not all of the ammunition. What's wrong with that? I think then you do get to the Second Amendment analysis because there's clear case law that says ammunition is protected under the Second Amendment because it's an essential part of what makes a gun fire. But a Glock switch doesn't. Glocks are sold across the country without Glock switches, and they work fine. They just are shot in a semi-automatic way. They can't fire thousands of rounds in one minute. It would be quite a magazine on a Glock if they would fire thousands of rounds in a minute. That's correct. Look, I think we've all heard of drum magazines and things of that nature. Some of those can hold 50 to 100 rounds, and they will go fast. But at the end of the day, that's just one reason why we submit it doesn't violate the Second Amendment. And that is the first reason is that we don't believe it's an arm, and Judge McNeil found it's not an arm. And I understand Judge said you may have some concerns with that finding. But I don't, and I think the record is clear that it's not an essential component to the firearm, and that unlike the bayonet, it can't do anything unless it's attached to the firearm. Are you familiar with this court's recent opinion in Peterson? Yes. In your mind, what extent does that control this case, or what impact, if at all, does it have on it? So we cited Peterson in a Rule 28J letter. I think that there's some good – the reasoning behind Peterson, if applied to this case, would show that the Glock switch is not protected by the Second Amendment too. I know Peterson is still in play on the appellate level, so I do think – but I do think that the rationale there is something the court should consider when reaching a decision in this case. Can we talk about – what's this again, dangerous and unusual? Yes. What is your understanding of unusual? Well, I think that you have to look at, one, I think Hollis says that machine guns are unusual. They were unusual then, maybe. But how do you think we – your friend on the other side says we're not bound by Hollis. It's been overtaken by tons of events. So I'm happy to talk about it, but if you might just indulge me for just a moment. Sure. Let's not pretend that case is not controlling for the reasons that your friend on the other side gave. Let's try to get to the merits of how do we go about figuring out what's unusual. I think that one of the things you can look at are potentially the statistics that were cited by my friend on the other side. One, they cite a number. It's around 740,000 registered machine guns in the United States. That number includes government and law enforcement entities. So that number is not civilian-owned firearms. That includes SWAT teams and things like that. Before we get to the actual how to apply the standard, can we just talk about what the standard is? Would it be statistics that existed? I mean presumably we're not looking at 1789, 1791 as far as I know. They were not machine guns at least as we understand them then. So what would be the nature of the statistical inquiry? Are we going back to 1934 when Congress first taxed them? 1968 when Congress amended the tax? 1986 when they straight-up banned civilian possession of post-market manufactured machine guns? Where would be the sort of locus of focus if that makes sense? Yeah, I think we have to look at it now. Are they unusual now? I think we do. I mean out of candor to the court, I think that's the question, right? Because if you looked at 1930s or if you went back to the time there weren't machine guns like the courts indicated. So I think you've got to look at it now. But even now with the numbers that they provided, if you look at the total number of firearms manufactured, the number of firearms imported, and less the number exported, you're looking at machine guns, registered machine guns being at like 5% or 6%, which is a low number. I agree with you. It's low. The thing I'm confused by is that we're living under 40 years, two full generations of a registry regime that makes it practically impossible for everyday Americans to possess machine guns. You can only possess them if they're manufactured prior to the ban date. You have to pay. And they're expensive. They're very expensive and big taxes and long waiting periods and registration requirements don't apply to any other form of weapon. And so, yeah, it's going to be unusual. If you ban them, it's going to be very difficult to possess them, practically ban them. It's going to be very difficult to possess them. So what would be the basis of making that the place that we would focus to figure out the unusuality question? Like why that? Why not 1986 or 1968 or 1934? I think that the jurisprudence from the Supreme Court is you look at it now. So sometimes that cuts against the government, and sometimes it benefits the government. In this case, it benefits the government because of those regimes in place, which kind of goes to those numbers too. After 1986, you could only possess firearms, machine guns that were manufactured before 1986. Hollis said there's 100,000, give or take, machine guns out there. Now it's 700,000. Those weren't machine guns manufactured after 1986, so most of those are going to be going to law enforcement entities or federally registered firearms dealers. But as a matter of constitutional interpretation, the upshot of the theory you just gave me is that your position is like fine wine. Because you're going to get stronger and better and better and better into the future. So the number of civilian-owned registered machine guns today by definition will be higher than it will be 10 years from now. So if you and I are back here in the same courtroom having the same question about 922-0 and how to apply the latest Supreme Court guidance on machine guns in 10 years, then it will be even more unusual and more unusual. So the theory is if Congress bans it for long enough, it becomes constitutionally okay. It's like the adverse possession theory of the Second Amendment. Well, I don't think that's the case because we actually have courts who have endorsed the ban since it first came into play. I mean Hollis did say at the first step of the analysis this isn't protected by the Second Amendment. That's what Hollis said, and that was shortly or a lot closer to the ban timeframe than we are right now. So, I mean, yes, but also it's not like Congress is just acting by themselves and these things aren't being litigated because it's been held constitutional since Congress enacted the law. So, I mean, I'd submit that it was constitutional then and it's constitutional now. Maybe it's even more constitutional now because of the ban, but it's constitutional. And, again, we'd submit and Judge McNeil found that Hollis was binding because they didn't apply the means in scrutiny. They said, hey, these firearms are unusual. The Second Amendment, we're taking Heller, we're taking the Supreme Court at its word. The Second Amendment doesn't protect dangerous, unusual weapons. These are dangerous and unusual, and that analysis still applies today. So that's another reason that we would say it does apply. And then because of the status of the case at the district court and Judge McNeil's ruling, which were that it's not an arm and Hollis is binding, we did not get into the history and tradition. But we did recently submit a Rule 28J letter that points the court to Duncan and its discussion of history and tradition of regulating dangerous and unusual firearms from pocket pistols to lances and things of that nature. We'd submit that that history, if the court says we're not bound by Hollis, dangerous and unusual applies at the second prong. How are some ways that the government has disarmed people from dangerous and unusual weapons? All of those would fit into the how and why of the prohibition on firearms that are set forth in Rahimi and in Bruin as well. Counsel, there's news stories all over about the proliferation of Glock switches and importation and how common and popular they're becoming. If they keep becoming popular, will Glock switches become less and less unusual and more and more usual in a Second Amendment sense? I don't think that people's choosing to engage in illegal activity should allow for constitutional protections to apply. And I think that that illegal conduct doesn't excuse or doesn't bring that type of conduct under the Second Amendment protection. Well, it's an unsettled question, isn't it? I mean the whole part of your third point, which I take – I understand your thing that's barred by the appeal waiver, and maybe we can't reach it here. But it's an unsettled question about whether and to what extent these rules reach things like a combination of little pieces of plastic. And so the fact that people are importing little pieces of plastic may become more and more usual and, hence, more and more protected. I'm assuming you would agree with me that the standard would go both ways, that you would get the benefit of having fewer and fewer machine guns as time goes on. But it could also be true that these machine gun parts and conversion kits become increasingly more and more common as time goes on. I think so, but I do think that there's a distinction between people importing those or having these pieces of plastic for use that is not illegal and not turning semiautomatics into automatic weapons. But I see that I've run out of time unless anyone else has any further questions. Thank you, Your Honor. Thank you, counsel. Ms. McIntyre, you have five minutes for rebuttal. To pick up where the court left off on the unusual analysis, I think I agree with the government that we do have to look at the numbers now. But I disagree that that is in the government's favor. I think that if you're looking at the numbers now, their argument is that we can only look at the machine guns that are legal. But I think to the court's point, we have all of these switches. We have all of these other parts and components that fit within the definition of a machine gun under—and I'm always going to forget the number of the statute, but as the court's aware. And so the numbers that we have offered, even the ATF numbers, don't encompass all of those pieces that qualify as machine guns under 922.0. And I think that the number, even beyond what we've submitted, would be much greater. And in Hollis, they considered specifically raw number, percentage, and proportion. And so those were the pieces of data that they were considering when making that unusual determination. I think by any metrics here, whether we go with the ATF numbers, which is really all we have, but if we assume that there is a greater number just on the basis of all of these, albeit illegal, existences of machine guns, whether defined by the statute or in a traditional sense, I think a consideration of that raw number, percentage, and proportion, all of those variables have changed. And they've changed to a great degree. We have four times. I would submit that it's likely more than that. And so accepting the government's statement that we have to consider it at this time, I think looking at that number at this time would compel this court to find that these machine guns are no longer unusual as to justify a historical tradition that would outright ban the mere possession of them. And I also quibble with the idea that a strategic decision to rely on pre-Bruin precedent can remove the burden of demonstrating a historical tradition. The government elected to rely on the pre-Bruin case law when it was defending the 922 argument. But the submission of cases that deal with accessories, which are distinct from integral component parts, like a Glock switch raised in 28J, cannot meet their burden under the Second Amendment and under the post-Bruin line of cases. And I think that integral component part analysis is important here. The Peterson case, which, again, we recognize is pending on Bonk, the suppressor was determined to be an accessory. And we distinguish the cases that the government has cited in 28Js with the Glock switch being akin to an accessory. Without the switch, you don't have the machine gun. And so then the Glock does not come under the machine gun prong. And so we would submit that when you have an integral component part that necessarily changes the function, it has to qualify as the machine gun. And so if machine guns are bearable arms, the Glock switches must also be bearable arms as that integral component part. To move on to the jurisdictional argument, the government mentioned the alleged act being the mere possession of the switches. I think that we need to look at what was actually charged in the information. There was not an information that charged juvenile has violated 922-0 because he possessed Glock switches. It specifically said juvenile has violated 922-0. We know that they had evidence and they showed this evidence and they used it in support of the factual basis that juvenile had a handgun that was equipped with a Glock switch. That is a crime under Mississippi law. And so the fact that the government did not specify that in the information I think bolsters our argument that they had the evidence and they used that evidence as they demonstrated in the factual basis to criminalize and convict juvenile on the basis of the Glock switch or the Glock that was equipped with the switch, which could have and should have fallen under Mississippi's ban on handguns possessed by juveniles. Unless the court has additional questions, I think that that's really all I have in response for rebuttal. Counsel, I have one question. Sure. Does the public defender's office have unusual statistics at different points in time when it comes to machine guns? Maybe not today, but if I asked you to file a letter, could you tell me what the proportion was of machine guns as a proportion of all guns in 1934, 1968, 1986? Could you do that? I would certainly like the opportunity to try. We obtained these via ATF, but I'm sure that with the resources that we have as an office, more broadly than our specific office, that we could pull something together and I would welcome the opportunity to submit that to the court. Thank you very much.  Very good. The case is submitted and that concludes the argument session for today. The court will stand in recess until 1 p.m. tomorrow afternoon.